**No. 25-11267**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

ERICA LAVINA and ANDREA DARLOW, individually and on behalf of all those similarly situated,

*Plaintiffs-Appellants,*

v.

JOHN D. ROOD, ET AL.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-cv-60001-BB

## BRIEF FOR PLAINTIFFS-APPELLANTS

**BERGER SINGERMAN LLP**
Mark S. Fistos, Esq.
Florida Bar No. 909191
201 East Las Olas Blvd.
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: (954) 525-9900
mfistos@bergersingerman.com
rpendas@bergersingerman.com
drt@bergersingerman.com

***Attorneys for Plaintiffs-Appellants***

**HILGERS GRABEN PLLC**
Alec H. Schultz, Esq.
Florida Bar No.  35022
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 630-8304
aschultz@hilgersgraben.com

Jennifer M. Erickson Baak, Esq.
600 17th Street
Denver, CO 80202
Telephone: (773) 407-5502
jericksonbaak@hilgersgraben.com

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellants hereby state that the following individuals and entities have an interest in the outcome of this case:

Agustin, Mark

Bayliss, Slater

Berger Singerman, LLP

Bloom, Beth (The Honorable)

Darlow, Andrea

Fistos, Mark S.

GrayRobinson, PA

Hebda, Kathy

Hilgers Graben PLLC

Hunt, Patrick M. (The Honorable)

Lavina, Erica

Levesque, George T.

Lovett, Radford

Miller, Troy

Rood, John D.

i

Starkey, Adria D.

Schultz, Alec H.

Thompson, Kevin

Zebersky, Edward H.

Zimmerman, Jason A.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Eleventh Circuit Rule 28-1(c), Plaintiffs-Appellants ("Plaintiffs") submit that oral argument will assist the Court in resolving this appeal.

This appeal raises an important question regarding federal courts' ability to review unconstitutional conduct by state actors under the *Ex parte Young* exception to sovereign immunity. Specifically, the case concerns whether the Eleventh Amendment provides absolute immunity to state actors who unilaterally amend contracts with private parties, resulting in ongoing reductions in contractual benefits in violation of the Contract Clause and Takings Clause.

In addition, oral argument would aid the Court in its consideration of whether Plaintiffs' Section 1983 claims are time-barred, where Plaintiffs bring as-applied claims, alleging continuing violations of the Contract Clause and Takings Clause. Oral argument would assist the Court by clarifying both the relevant facts and legal standards necessary to answer these questions.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ............................... iii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE ..................................................................3

     I.     STATEMENT OF THE FACTS ................................................3

     II.    PROCEDURAL HISTORY...................................................13

     III.   STANDARD OF REVIEW ..................................................15

SUMMARY OF THE ARGUMENT .......................................................17

ARGUMENT AND CITATIONS OF AUTHORITY ..............................18

     I.     The District Court Erred In Finding Defendants Are
           Protected By Sovereign Immunity........................................18

          A.    Plaintiffs Allege Ongoing Violations of Federal
               Law and Seek Prospective Relief. ...........................20

          B.    The District Court's Decision Contravenes
               Supreme Court and Eleventh Circuit Precedent.......22

               1.    Prospective injunctions fall within the
                    *Ex parte Young* exception even when they
                    cause "direct and substantial" financial
                    impacts...............................................................22

               2.    *Seminole Tribe* is distinguishable on the
                    facts....................................................................26

               3.    The district court's holding significantly
                    diminishes the *Ex parte Young* exception. .......29

II.    The District Court Erred in Finding Plaintiffs' Claims
Time-Barred. ...............................................................31

    A.    Plaintiffs' Claims Accrued When Defendants
Applied the TDF Law to Their Plans. .........................32

    B.    Defendants Continue to Violate the Constitution
Each Time They Interpret and Apply the TDF
Law To Deny Plaintiffs Plan Benefits.........................38

CONCLUSION ...................................................................41

CERTIFICATE OF COMPLIANCE.........................................43

CERTIFICATE OF SERVICE.................................................44

ADDENDUM TO THE PLAINTIFFS-APPELLANT'S BRIEF..............45

    Text of Fla Stat. § 1009.24(16).........................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Attwood v. Clemons*,
  818 F. App'x 863 (11th Cir. 2020).......................................................21

*Chapman v. Dunn*,
  129 F.4th 1307 (11th Cir. 2025) ................................................ 15, 34

*\* Doe v. Swearingen*,
  51 F.4th 1295 (11th Cir. 2022) ................................................ *passim*

*\* Edelman v. Jordan*,
  415 U.S. 651 (1974)........................................... 19, 22, 23, 26

*Green v. Mansour*,
  474 U.S. 64 (1985)...........................................................................19

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009)................................................. 33, 34

*Howard v. Coonrod*,
  546 F. Supp. 3d 1121 (M.D. Fla. 2021).............................................38

*Karantsalis v. City of Miami Springs*,
  17 F.4th 1316 (11th Cir. 2021) ........................................................16

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019)............................................................28

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*,
  269 F.3d 494 (5th Cir. 2001)...................................................... 30, 31

*Luckey v. Harris*,
  860 F.2d 1012 (11th Cir. 1988).........................................................24

*Maron v. Chief Fin. Officer of Fla.*,
  136 F.4th 1322 (11th Cir. 2025) ................................................ 15, 24

*Milliken v. Bradley,*
  433 U.S. 267 (1977)..................................................................23, 24

*Penn Central Transportation Co. v. City of New York,*
  438 U.S. 104 (1978)........................................................................29

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)..........................................................................18

*Pharm. Rsch. & Manufacturers of Am. v. Williams,*
  64 F.4th 932 (8th Cir. 2023) ..........................................................30

*Quern v. Jordan,*
  440 U.S. 332 (1979)........................................................................24

*Renfroe v. Nationstar Mortg., LLC,*
  822 F. 3d 1241 (11th Cir. 2016)................................................ 16, 39

*Rossborough Mfg. Co. v. Trimble,*
  301 F.3d 482 (6th Cir. 2002)..........................................................30

\* *Seminole Tribe of Fla. V. Fla. Dep't of Revenue,*
  750 F.3d 1238 (11th Cir. 2014)............................................... *passim*

*Snyder v. Fla. Prepaid Coll. Bd.,*
  269 So. 3d 586 (Fla. Dist. Ct. App. 2019) .......................................9

*Tokyo Gwinnett, LLC v. Gwinnett Cty.,*
  940 F.3d 1254 (11th Cir. 2019)......................................................35

*United States Trust Co. v. New Jersey,*
  431 U.S. 1 (1977)............................................................................29

*Verizon Md. Inc. v. PSC,*
  535 U.S. 635 (2002)................................................................. 15, 19

*Virginia Off. For Prot. & Advoc. v. Stewart,*
  563 U.S. 247 (2011)........................................................................25

*Wainberg v. Mellichamp,*
  93 F.4th 1221 (11th Cir. 2024) ............................................ 15, 16, 38

*Weissman v. NASD*,
  500 F.3d 1293 (11th Cir. 2007)............................................................ 15

*William v. Horton*,
  No. 1:15-CV-3792-WSD, 2016 WL 6582682 (N.D. Ga. Nov.
  7, 2016).............................................................................................. 27

\* *Ex parte Young*,
  209 U.S. 123 (1908)................................................................... *passim*

**Statutes**

42 U.S.C § 1983 ............................................................................... 1, 12

28 USC 1332(d)(2) ................................................................................. 1

28 USC § 1291 ...................................................................................... 1

28 USC § 1331 ...................................................................................... 1

28 USC §§ 2201 & 2202......................................................................... 1

Fla Stat. § 1009.24(16)(a)-(b) ............................................................... 36

Fla. Stat. § 1009.24(16)(b)5 ................................................................... 7

Fla. Stat. § 1009.97 (3)(g) ............................................................... 36, 37

\* Fla. Stat. § 1009.98[1] ..................................................................... *passim*

Fla. Stat. § 1009.971.......................................................................... 5, 39

Fla. Stat. § 1009.972.......................................................................... 5, 28

**Other Authorities**

17A Fed. Prac. & Proc. Juris. § 4231 (3d ed.) ......................................... 18

Fed. R. App. Pro. 4(a)(1)(A) .................................................................. 1

---

[1] An excerpt of Fla. Stat. §1009.98(16) is included in the Addendum to this brief at Page 45.

Fed. R. Civ. Pro. 12(b)(1) and 12(b)(6) .................................................... 13

S.B. 1710, 2006-2008 Leg., Reg. Sess. (Fla. 2007) ............................... 7, 8

\* U.S. Const. amend. V ............................................................... *passim*

\* U.S. Const. amend. XI ..................................................... 15, 16, 18, 19

U.S. Const. amend. XIV ................................................................. 1, 20

U.S. Const. art. I, § 10, cl. 1 ...................................................... 1, 12, 20

## JURISDICTIONAL STATEMENT

Plaintiffs brought this class action against Defendants, members of the Florida Prepaid College Board ("Prepaid Board") asserting the following two causes of action pursuant to 42 U.S. § 1983: violation of the Contract Clause of the United States Constitution (U.S. Const. art. I, § 10, cl. 1), and violation of the Takings Clause in the Fifth Amendment (U.S. Const. amends. V and XIV). The district court had subject matter jurisdiction under 28 USC § 1331 (Federal Question); 28 USC 1332(d)(2) (Class Action Fairness Act); and 28 USC §§ 2201 & 2202 (Declaratory Judgment Act).

On March 17, 2025, the district court dismissed the complaint with prejudice and ordered the clerk of the court to close the case. Doc. 58. This Court has appellate jurisdiction over final decisions of the district courts of the United States pursuant to 28 USC § 1291. This appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it was filed on April 15, 2025. Doc. 59.

## STATEMENT OF THE ISSUES

1. Does the exception to sovereign immunity created by *Ex parte Young* apply to claims asserted against state actors for ongoing deprivations of contractual benefits in violation of the Contract Clause and Takings Clause of the U.S. Constitution, where Plaintiffs seek only prospective declaratory and injunctive relief?

2. With regard to the statute of limitations, did the district court err in holding Plaintiffs' claims accrued at the time the TDF legislation passed in 2007, where Plaintiffs allege their injury stems from Defendants' interpretation and application of the law to their Plan benefits, which did not begin until 2021, and Plaintiffs alleged they will continue to be injured each time Defendants interpret the law to diminish their Plan benefits going forward?

## STATEMENT OF THE CASE

### I.     STATEMENT OF THE FACTS

This case concerns the Florida Prepaid Board's unilateral decision to interpret and apply the terms of its Prepaid Plans in such a way as to deny the full value of the "tuition benefit" to individuals who purchased the Prepaid Plans for beneficiaries who attend out-of-state schools (Non-Florida State Schools). Doc. 15, Pgs. 2-5 ¶¶ 1-6. The effects of the Prepaid Board's policies are wide-reaching; each year, roughly 13,000 beneficiaries of these Prepaid Plans attend Non-Florida State Schools. *Id.* at Pg. 3 ¶ 4.

Plaintiffs' Amended Complaint brings two counts against the Prepaid Board Members, alleging their ongoing actions will deprive Plaintiffs and Class Members of their future Plan benefits in violation of the Contract Clause and Takings Clause of the United States Constitution. Plaintiffs seek declaratory and injunctive relief requiring Board Members to include compensation for all tuition fees in future interpretations and applications of the tuition benefit in their Plans. *See generally* Doc. 15, Pgs. 26-31.

3

### *The Prepaid Fund, Plaintiffs' Rights, and their Plan Contracts*

The Florida Legislature created the Florida Prepaid College Program "to provide a medium through which the cost of registration and dormitory residence may be paid in advance of enrollment in a state postsecondary institution at a rate lower than the projected corresponding cost at the time of actual enrollment." Fla. Stat. § 1009.98(1). In its marketing materials, the Prepaid Board explained: "[C]ollege costs in Florida are expected to quadruple by the time today's newborn goes to college. . . But with the Florida Prepaid College Program you don't have to worry . . . The program guarantees to cover the cost when your children are ready for college." Doc. 15, Pgs. 8-9 ¶ 22.

Plaintiffs brought this action on behalf of themselves and a class who purchased a Florida Prepaid College Plan from the Florida Prepaid College Board before or during the 2006-2007 enrollment period. Doc. 15, Pg. 2 ¶ 1. Specifically, Plaintiffs and Class Members purchased Plan Contracts offered by the Prepaid Board for a "Tuition Plan" (Plan). Doc. 15, Pg. 2 ¶1. Pursuant to these Plans, Plaintiffs prepaid tuition to cover a set number of credit hours. Doc. 15-3, Pg. 4 § 3.02 (Plan Contract describing the terms of the Tuition Plan). Relevant here, the Plans

4

provide that, if the beneficiary attends a private or out-of-state school (Non-Florida State School), then the Prepaid Board will transfer the equivalent value of the Plan – an amount tied to the "current rates at state universities and community colleges in Florida" – to that school. Doc. 15-3, Pg. 5 § 5.06 (transfer provision); *see also* Doc. 15, Pg. 9 ¶¶ 23-24 (marketing materials explaining the transfer benefit). The Contracts do not define the term "rates." *See* Doc 15-3, Pg. 3 § 1 (Definitions).

The Prepaid Board is a state agency that operates under the direction, control, and polices set by Defendants – the Members of the Board. Among other things, Defendants have the independent authority to "provid[e] and pay[] benefits under [Plaintiffs'] Plan contracts, interpret[], apply[], and enforce their terms, and transfer[] the benefits of the Plans to Non-Florida State Schools." Doc. 15, Pgs. 6-8 ¶¶ 14-21 (citing Fla. Stat. § 1009.971(1) and (3)-(6) and Fla. Stat. § 1009.98); *see also id.* at Pg. 18 ¶¶ 49-50 (Defendants have claimed they have the authority to change the substantive terms of their contracts via the Florida Administrative Code).

Monies paid by plan purchasers do not go to the state treasury but instead are held in a Fund managed by the Prepaid Board. Fla. Stat. §

1009.972. The Fund presently has a $4 billion surplus. Doc. 15, Pg. 21 ¶ 58.

### *The TDF Law and Exemption*

In 2006, Florida officials and legislators began considering the adoption of a new tuition fee designed to enhance the quality of higher education. Doc. 15, Pgs. 11-12 ¶¶ 32-33. The effort was well-publicized and drew concern from the Prepaid Board. *Id.* at Pg. 12 ¶ 33. As the Prepaid Board's internal minutes make clear, the Board viewed the new proposed "fee" as a form of tuition that it would be responsible for paying under its Plan Contracts. Doc. 15, Pg. 12-13 ¶¶ 33-35. For example, the Prepaid Board's Meeting Minutes from December 2006, reveal their concern that the "fee is nothing more than a tuition increase and their Prepaid plan should cover the new fee." *Id.* at Pg. 12 ¶ 34; *see also id.* at Pg. 13 ¶ 35 ("in the past these types of costs have been covered by tuition"); *id.* at Pg. 14 ¶ 38 (Dec. 13, 2006 Prepaid Board Press Release acknowledging "Florida families who had purchased Prepaid College tuition plans understood the plan would pay the actual costs of tuition when their child attended college" and expressing "concern that, although the Board of Governors proposal was identified as a 'fee,' some

6

might consider it to be 'tuition' because in the past these types of costs have been covered by tuition"). This concern was echoed by the Prepaid Board's attorney. *See id.* at Pgs. 13-14 ¶¶ 36-37 (Opinion Letter). It was also documented in statements made in legislative committee hearings by the Chairman of the Prepaid Board and the founder of the Florida Prepaid College Program in March 2007. *See id.* at Pgs. 15-16 ¶¶ 40-43 ("For this bill to pass now and use the word 'fee' instead of 'tuition' is a joke. It's a façade. This is really tuition." "You're doing something wrong to the thousands of families that really believe that when they purchased that contract and paid for it over 18 years, that they were paying for tuition."). Prepaid Board members voiced concern that the amount of this new tuition "fee" would effectively equate to a 41% or 50% increase in tuition. Doc. 15, Pg. 14 ¶ 39; *id.* at Pg. 16 ¶ 43.

In a partial compromise, the legislature passed a law creating the new tuition fee – the "Tuition Differential Fee" (TDF) – but exempted the beneficiaries of Plan Contracts that were in effect on July 1, 2007 and remain in effect, from having to pay this supplemental tuition fee. *See* S.B. 1710, at § 1-2, 2006-2008 Leg., Reg. Sess. (Fla. 2007). (adding Fla. Stat. §1009.24(15)(c) (2007), which now appears in Fla. Stat. §

1009.24(16)(b)5 (2024)).[2]; *see also* Doc. 15, Pg. 10 ¶ 26; *id.* at Pg. 17 ¶¶ 44-45.[3] The TDF law and exemption were silent on how it would apply to existing contract holders if their beneficiaries enrolled in Non-Florida State Schools. *Id.*

The Prepaid Board touted that, with the passage of the exemption, "The Promise is kept to Families with Plans." *Id.* at Pg. 17 ¶ 47; *see also id.* at Pg. 18 ¶ 48.

### *The Prepaid Board Unilaterally Changes Plan Contracts*

After the enactment of the TDF law, the Prepaid Board substantively changed the terms of the Plan Contract; Defendants interpret this amendment to exclude the TDF from coverage under Plaintiffs' tuition Plans. Doc. 15, Pg. 18 ¶49. The Prepaid Board has taken the position that the Florida Administrative Code gives it the right to change the substantive terms of its contracts, including changing

---

[2] An excerpt of Fla. Stat. §1009.98(16) is included in the Addendum to this brief at Page 45.

[3] The TDF law also permitted the Prepaid Board and its members to commence selling plans that expressly covered the TDF, but this option was not made available to contract holders like Plaintiffs who had purchased their plans prior to the enactment of the TDF. Doc. 15, Pg. 17 ¶¶ 45, 47; Doc. 15-13, Pg. 9 (available to "new customers"); S.B. 1710, 2006-2008 Leg., Reg. Sess. (Fla. 2007) § 3; compare Fla. Stat. § 1009.98(2)(b)3 (2024).

terms, benefits, and coverage within those contracts to materially change Plaintiffs' substantive rights. Doc. 15, Pg. 18 ¶ 50.[4] The Prepaid Board's amendment to Plan Contracts was implemented with no notice to Plaintiffs and putative Class Members that would have explained their reduced benefits and contract values if they used their Plans for Non-Florida State Schools. Doc. 15, Pg. 21 ¶ 59.

In addition, in 2020 and 2024, the Prepaid Board, under the direction and control of Defendants, unilaterally offered refunds or reductions in the cost of those plans purchased after the 2007-2008 enrollment period, *i.e.*, *after* Plaintiffs purchased their Plans. Doc. 15, Pgs. 4-5 ¶ 6; *id.* at Pg. 22 ¶ 63. Purchasers, like Plaintiffs, who bought their Plans during and before the 2006-2007 enrollment period were not provided with a refund or any price reduction. *Id.* at Pg. 22 ¶ 64.

---

[4] In 2015, a purchaser named Susan Snyder, sued the Prepaid Board in Florida state court asserting claims for breach of contract. *See generally Snyder v. Fla. Prepaid Coll. Bd.*, 269 So. 3d 586 (Fla. Dist. Ct. App. 2019). The complaint was dismissed on summary judgment after the court found the Prepaid Board was authorized to unilaterally change the terms of her contract. *Id.* at 592. *Snyder* did not involve a federal "takings" claim or expressly decide any other federal constitutional claim under federal law.

9

### *Defendants Interpret Plaintiffs' Plan Benefits*

The result of the Prepaid Board's policies and actions is a substantial reduction in the value of the benefits provided by Plaintiffs' Plans. Doc. 15, Pgs. 19-20 ¶¶ 54-56; *see also id.* at Pgs. 22-23 ¶ 66. Defendants first interpreted and applied the Plan amendment and the TDF law and exemption to Plaintiff Darlow's 2004 Plan Contract beginning in 2021. Ms. Darlow's daughter began attending a Non-Florida State School in the Fall of 2021. Doc. 15, Pgs. 19-20 ¶ 54. At that time, Defendants paid the institution $2,619.70 for 17 credit hours, instead of $3,616.07, which is the equivalent cost for attending a Florida State School ($212.71/credit hour). *Id.* The difference was due to Defendants' application of the TDF law and the purported amendment to Ms. Darlow's pre-2008 contract, which resulted in Defendants' refusal to pay Ms. Darlow's daughter's institution the equivalent tuition value of the TDF. *Id.* Ms. Darlow's daughter has continued to attend a Non-Florida State School and incur a similar discrepancy. *Id.*

Plaintiff Lavina's daughter was set to attend a Non-Florida State School in Fall 2024. When Ms. Lavina contacted Defendants about transferring her 2006 Plan Contract benefits, she was told that

10

Defendants would only pay $155.00 per credit hour, as opposed to the anticipated $212.71 per credit hour it costs to enroll at a Florida State School. Doc. 15, Pg. 20 ¶ 55. As with Ms. Darlow, the difference was due to Defendants' application of the TDF law and their post-2008 contract amendment to Ms. Lavina's pre-2008 contract. *Id.*

### *Defendants' Ongoing Control Over Plaintiffs' Plan Contracts*

Defendants continue to apply the TDF law and amendment to contend that the value of the TDF and its payment exemption are not transferrable to pay any portion of the tuition of pre-2008 Plan Contract Beneficiaries (such as Plaintiffs') who attend Non-Florida State Schools. Doc. 15, Pg. 11 ¶¶ 29-30. The Board Members have asserted that they will continue to interpret, apply and enforce Florida Statutes in this manner to deny Plaintiffs' TDF-related benefits under their Plan Contracts. Doc. 15, Pg. 19 ¶ 53.

Plaintiffs estimate that roughly 13,000 Plan Beneficiaries per year will be denied the benefits of their Plan Contracts in a similar manner. Doc. 15, Pgs. 20-21 ¶ 57.

### *Plaintiffs' Claims*

Plaintiffs bring two claims under 42 U.S.C § 1983, on behalf of themselves and a class of purchasers, alleging substantial ongoing and future deprivation of their constitutional rights in violation of the Contract Clause of the U.S. Const. Art. I, § 10, cl. 1, and an unconstitutional taking under U.S. Const. amend. V.  Doc. 15, Pg. 3-4 ¶¶ 4-5; *id.* at Pg. 5 ¶ 8; *id.* at Pg. 19 ¶ 53; *id.* at Pgs. 26-30 ¶¶ 77-93.

Plaintiffs' claims arise from Defendants' interpretation and application of the TDF law and exemption, as well as their subsequent amendment, to Plaintiffs' Plan Contracts. Specifically, Plaintiffs allege Defendants' "continuing and future application and use of the 2007 TDF law and exemption . . . and/or their Plan Contract changes . . . are causing and will cause Plaintiffs and Class Members to suffer a substantial and future deprivation of their contract rights in violation of the Contract Clause of the U.S. Constitution." Doc. 15, Pg. 28 ¶ 83. Plaintiffs likewise allege that Defendants actions in their "application of the exemption and TDF definition and/or change to the substantive terms and benefits of the Plan Contract . . . are Takings and will be Takings." *Id.* at Pg. 29 ¶91.

Plaintiffs seek a declaration that Defendants' "continuing interpretation and application" of its policies surrounding the TDF are violations of the Contracts Clause and Takings Clause of the United States Constitution, and an injunction preventing Defendants from applying these policies going forward. Doc. 15, Pgs. 30-31.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on January 2, 2024, Doc. 1, and subsequently filed the operative Amended Complaint. Doc. 15. Defendants moved to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting numerous arguments. Doc. 24. Relevant here, Defendants argued that the doctrine of sovereign immunity stripped the court of subject matter jurisdiction, and that the claims were barred by the statute of limitations. *Id*. at 6-12.

The district court judge, Judge Bloom, referred the motion for a report and recommendation to Magistrate Judge Hunt. Doc. 45. In his 23-page Report and Recommendation, Magistrate Judge Hunt recommended that Defendants' motion be denied. Doc. 55, Pgs. 2, 22. Regarding sovereign immunity, Magistrate Judge Hunt found that

13

Plaintiffs' claims fell within the exception to sovereign immunity provided by *Ex parte Young* because Plaintiffs allege "ongoing violation of federal law and they are seeking prospective relief." Doc. 55, Pg. 11. Regarding the statute of limitations argument, Magistrate Judge Hunt found the claims timely because Plaintiffs asserted "as applied" challenges to Defendants' interpretation and application of the TDF to their Plans, and because they alleged violations were continuing. *Id.* at Pg. 14.

Judge Bloom rejected the Report and Recommendation on both issues. Doc. 58. First, Judge Bloom held the Defendants were protected by the doctrine of sovereign immunity because, although the Amended Complaint purported to seek prospective declaratory and injunctive relief, the effect of such an order would be "a monetary award" which was outside the *Ex parte Young* exception. *Id.* at Pg. 9. Second, Judge Bloom held Plaintiffs' claims were barred by the applicable statute of limitations because Plaintiffs' claims accrued when the Florida legislature passed the TDF law in 2007, rather than when Defendants applied the law to interpret Plaintiffs' Plans beginning in 2021. *Id.* at Pg. 13. As a result,

14

Judge Bloom granted Defendants' motion and dismissed Plaintiffs' Amended Complaint with prejudice. *Id.* at Pg. 17.

## III.   STANDARD OF REVIEW

The Court reviews the district court's dismissal on the basis of sovereign immunity *de novo*, accepting all well-pleaded factual allegations as true and construing all inferences to be drawn therefrom in the light most favorable to the plaintiff. *Weissman v. NASD*, 500 F.3d 1293, 1295 (11th Cir. 2007); *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1329 (11th Cir. 2025). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 645 (2002) (quotation omitted).

This Court reviews the district court's interpretation and application of the statute of limitations *de novo*.  *Chapman v. Dunn*, 129 F.4th 1307, 1315 (11th Cir. 2025). The statute of limitations is an affirmative defense, which a plaintiff is not required to negate in the complaint. *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024).

As a result, a complaint "should not ordinarily be dismissed" on this basis; rather "dismissal on statute-of-limitations grounds is proper only where it is apparent from the face of the complaint that the claim is time-barred." *Id.* (quotations omitted). In making that determination, the Court must view the allegations of the complaint in the light most favorable to Plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences therefrom. *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1319 (11th Cir. 2021). A court errs when it elevates a defendant's own conclusions above the allegations in the complaint. *Renfroe v. Nationstar Mortg., LLC*, 822 F. 3d 1241, 1242 (11th Cir. 2016).

## SUMMARY OF THE ARGUMENT

The district court's order, dismissing Plaintiffs' claims with prejudice based on Eleventh Amendment sovereign immunity and the statute of limitations is premised on numerous legal and factual errors that require reversal.

First, the district court's holding that Defendants are protected by sovereign immunity contravenes well-established Supreme Court precedent that permits constitutional claims against state actors seeking prospective relief, even when that relief has a financial effect. The court's decision has the effect of providing self-interested state actors absolute immunity when they unilaterally amend contracts with private parties in such a way as to cause substantial, ongoing, and future deprivation of the parties' constitutional rights. This significantly limits the scope of *Ex parte Young* as well as federal courts' abilities to review unconstitutional actions by state actors.

In addition, the district court failed to apply the correct legal standard in determining when Plaintiffs' as-applied constitutional challenges accrued for purposes of the statute of limitations. Unlike facial challenges, which run from the date of enactment of the legislation,

17

accrual of as-applied challenges is tied to when legislation is enforced or threatened to be enforced against the plaintiff. This fact-intensive inquiry turns on the allegations in the Amended Complaint. Not only did the district court fail to engage in this inquiry, but on one key issue, it improperly elevated Defendants' assertion of fact above what was alleged in the Amended Complaint.

Reversal is warranted.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    The District Court Erred In Finding Defendants Are Protected By Sovereign Immunity.

This case concerns the intersection between states' sovereign immunity established by the Eleventh Amendment and federal courts' abilities to enforce the Constitution against states through the Supremacy Clause.

By way of background, the Eleventh Amendment generally bars federal courts from hearing suits brought by a citizen against her own state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). In 1908, the Supreme Court carved out a significant exception: it held that a suit against a state official is not one against the state if it challenges the constitutionality of the official's actions. *Ex parte Young*,

18

209 U.S. 123, 159-60 (1908). This is because, when a state official enforces an unconstitutional statute, the official is "stripped of his official or representative character." *Id.* at 142.

The Supreme Court's decision in *Ex parte Young* effectively established "the power of the federal courts to enforce the Constitution against state legislative and executive action." 17A Fed. Prac. & Proc. Juris. § 4231 (3d ed.). "The effect of *Ex parte Young* is . . . to subject the states to the restrictions of the United States Constitution that they might otherwise be able safely to ignore." *Id.*

In *Edelman v. Jordan*, the Supreme Court clarified the scope of the *Ex parte Young* exception. The exception applies where the relief sought is "prospective only," and cannot be used to seek "monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 U.S. 651, 664, 668 (1974). The Court has since explained: "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citations omitted).

Thus, in determining whether a case falls within *Ex parte Young*, the "court need only conduct a straightforward inquiry into whether the complaint, [1.] alleges an ongoing violation of federal law and [2.] seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quotation omitted).

### A.  Plaintiffs Allege Ongoing Violations of Federal Law and Seek Prospective Relief.

Plaintiffs' Amended Complaint squarely meets the two-part test. It seeks "declaratory and injunctive relief for a continuing and anticipated future violation of the Contract Clause of the United States Constitution (U.S. Const. art. I, § 10, cl.1)" as well as "for a continuing and anticipated future violation of the Takings Clause contained in the Fifth Amendment to the United States Constitution, made applicable to the states in the Fourteenth Amendment (U.S. Const. Amends. V and XIV)." Doc. 15, Pg. 26 ¶ 78; *id.* at Pg. 28 ¶ 86. Specifically, Plaintiffs seek declarations that "Prepaid's Board Members' and the Board ED's continuing interpretation and application . . . of the TDF exemption and TDF definition . . . and application of the related changes Defendants made to the Plan Contracts of Plaintiffs and said Class Members in response thereto, are violations of the Contract Clause of the United States Constitution . . .

20

[and] of the Takings Clause of the United States Constitution," as well as an injunction prohibiting "Defendants from applying the TDF exemption and TDF definition . . . and applying Defendants' changes to the Plan Contracts of Plaintiffs and Class Members whose Plan Beneficiaries attend Non-Florida State Schools." Doc. 15, Pgs. 30-31. (statutory citations omitted).

These remedies, which are directed toward Defendants' "continuing and anticipated future" interpretation of contractual benefits, are not directed toward the Board Members' past refusals to transfer the full amount of Plaintiffs' tuition benefits. And the relief – declarations and an injunction – are inherently forward-looking and do not ask the court to award monetary damages. *See Attwood v. Clemons*, 818 F. App'x 863, 868 (11th Cir. 2020) ("An injunction is necessarily prospective, and the Supreme Court has held that declaratory relief is treated the same when it exposes the defendant to no more liability than an injunction."); *see also* Doc. 55, Pg. 11 (Report and Recommendation finding the Amended Complaint satisfied the two inquiries).

**B.    The District Court's Decision Contravenes Supreme Court and Eleventh Circuit Precedent.**

The district court, however, reached the opposite conclusion, holding the *Ex parte Young* exception did not apply. Doc. 58, Pgs. 7-12. It reasoned that "Plaintiffs seek a monetary award" because "enjoin[ing] Defendants from applying the TDF exemption and definition . . . would, in essence, require Defendants to pay the value of the TDF to Plaintiffs and the class members." *Id.* at Pg. 9. The court additionally found that Plaintiffs' desired relief was "synonymous with a refund to be paid by the State," rendering the case was analogous to *Seminole Tribe of Fla. V. Fla. Dep't of Revenue*, 750 F.3d 1238 (11th Cir. 2014), in which the Eleventh Circuit held that an Indian tribe's claims seeking refunds of pre-collected fuel taxes was barred by sovereign immunity. *Id.* at Pgs. 10-11.

The district court's holding was contrary to both the law and the facts; leaving it in place would result in a rule that drastically undermines the scope of *Ex parte Young*.

**1.    Prospective injunctions fall within the *Ex parte Young* exception even when they cause "direct and substantial" financial impacts.**

In *Edelman*, the Supreme Court directly addressed the issue of declaratory and injunctive relief that has a financial impact on the state.

22

The Court explained that prospective relief may have "fiscal consequences to state treasuries," where such consequences are "the necessary result of compliance with decrees which by their terms were prospective in nature." 415 U.S. at 667-68. The Court specifically recognized that "an ancillary effect on the state treasury is a ***permissible and often an inevitable consequence*** of the principle announced in *Ex parte Young*" allowing prospective relief. *Id.* at 668 (emphasis added).

The facts in *Edelman* are instructive. There, the Supreme Court considered two claims: 1) that Illinois officials administering a benefits program were failing to make eligibility determinations within the timeframe required by federal law, and 2) that, because of the delay, the officials had wrongfully withheld several months' worth of past benefits. 415 U.S. at 655-56. The Court held the district court's injunction requiring future compliance with the federal time limits fell within the *Ex parte Young* exception, but its order requiring the officials to release and remit past benefits wrongly withheld, did not. *Id.* at 656, 664. The Court acknowledged, "State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to

23

pursue their previous course of conduct," but that "[s]uch an ancillary effect on the state treasury is a permissible and often an inevitable consequence" of *Ex parte Young. Id.* at 668; *see also Milliken v. Bradley*, 433 U.S. 267, 289 (1977) ("*Ex parte Young* permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a ***direct and substantial impact*** on the state treasury.") (citation omitted, emphasis added).

This Supreme Court has affirmed this principal repeatedly. *See, e.g., Milliken*, 433 U.S. at 290  (affirming order that the state bear half the cost of implementing desegregation programs, explaining "[t]hat the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates prospectively to bring about the delayed benefits of a unitary school system"); *Quern v. Jordan*, 440 U.S. 332, 347 (1979) (rejecting the defendant's argument that "giving the proposed notice [advising class of available administrative remedies] will lead inexorably to the payment of state funds for retroactive benefits and therefore it, in effect, amounts to a monetary award"). And it remains good law; the Eleventh Circuit recognized this principal in a case against Florida officials just this year. *See Maron v. Chief Fin. Officer of Fla.*, 136

24

F.4th 1322, 1333-34 (11th Cir. 2025) ("The State contends that the request to 'pay the Marons and class members past monetary gains when they file a claim in the future . . . amounts to nothing more than a prospective request for retroactive monetary damages.' We disagree."); *see also Luckey v. Harris*, 860 F.2d 1012, 1014 (11th Cir. 1988) ("This exception has been developed over the years to permit prospective relief against state officers in their official capacities to refrain from unconstitutional conduct even though compliance may cost the state money.").

Rather than follow this precedent, the district court relied on a different Supreme Court case, *Virginia Off. For Prot. & Advoc. v. Stewart*, for the proposition that "'*Ex parte Young* cannot be used to obtain an injunction requiring payment of funds from the State's treasury[.]'" Doc. 58, Pg. 7 (quoting *Stewart*, 563 U.S. 247, 256-57 (2011)). But an examination of *Stewart* reveals that the Court there was not announcing some new limitation on *Ex parte Young*, but merely paraphrasing *Edelman's* prohibition on claims seeking monetary compensation for a past breach. *See Stewart*, 563 U.S. at 256-57 (citing *Edelman*, 415 U.S. at 666). Indeed, *Stewart* did not concern a claim for monetary

25

compensation at all; instead it considered the entirely different question of whether a state agency could sue officers of the state. *See id.* at 256 ("[T]he limits we have recognized reflect the principle that the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought, not who is bringing the lawsuit.") (quotation omitted, citation omitted).

Viewed in the proper framework, it is plain Plaintiffs are not seeking recovery of the *past benefits* that Board Members have wrongly withheld – the type of claim proscribed by *Edelman*. Instead, they seek prospective orders enjoining Defendants from administering their benefits in a way that violates the Contract Clause and Takings Clause in the future. As in *Edelman*, the fact that a direct effect of the injunction will be Plaintiffs' receipt of increased benefits in the future does not set it outside *Ex parte Young*.

### 2. *Seminole Tribe* is distinguishable on the facts.

In addition, the district court's reliance on *Seminole Tribe* was misplaced, as that case concerned claims seeking compensation for past harms. *Seminole Tribe* concerned a policy under which the State of Florida pre-collected a fuel tax from all consumers and then issued

refunds after the fact for individuals and groups it found were entitled to an exemption. 750 F.3d at 1240. In a divided opinion, the Eleventh Circuit explained that the declaratory judgment the plaintiffs sought, finding the Tribe exempt from the tax, was "'the functional equivalent'" of "ordering recurring payments of money damages." *Id.* at 1245 (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999)).[5] The Court emphasized that this was a result of "the manner in which Florida has structured collection of its fuel tax." *Id.* at 1246; *see also id.* at 1245 ("The Tribe points to no other way around the alleged constitutional violation other than a recurring refund paid to the Tribe from the Department after it precollects the tax from the fuel suppliers."). And it suggested that the result would have been different if the Tribe had instead challenged the State's pre-collection of the tax, rather than its refusal to issue the refund. *Id.* at 1246 ("the Tribe might sue to enjoin the tax collector from collecting the illegally assessed tax").

---

[5] The full quote from *Summit Medical Associates* reads: "If the prospective relief sought is the functional equivalent of money damages however, *i.e.*, 'it is measured in terms of a monetary loss resulting from a past breach of a legal duty,' *Ex parte Young* does not apply." 180 F.3d 1337 (quoting *Edelman*, 415 U.S. at 669). Thus, this analysis remains inherently tied to *when* the injury occurred.

27

*Seminole Tribe* is thus distinguishable because the plaintiffs there sought monetary compensation for past harms – the earlier imposition of the tax. *See, e.g., William v. Horton*, No. 1:15-CV-3792-WSD, 2016 WL 6582682, at *8 (N.D. Ga. Nov. 7, 2016) (distinguishing the case on this basis). Here, by contrast, Plaintiffs here do not allege that their initial purchase of the Plan Contracts somehow violated the law, nor do they seek compensation for the Prepaid Board's past interpretations and deprivations of their benefits. Instead, they are seeking to have state officials interpret and enforce their future contractual benefits in a manner consistent with the Constitution. Put another way, Plaintiffs do not bring a claim for rescission. Rather, they seek the benefit of their bargain – a transfer of their tuition benefit to a Non-Florida State School, pegged to the "current rates at state universities and community colleges in Florida." Doc. 15-3, Pg. 5 § 5.06.

Finally, Plaintiffs' proposed relief does not amount to a "raid on the state treasury," as the Court found in *Seminole Tribe*. 750 F.3d at 1246. Plan benefits are paid from the statutorily created Prepaid Fund. Fla. Stat. § 1009.972; *see also* Doc. 15, Pg. 21 ¶ 58 (the fund presently has a $4 billion surplus). Changing how future monies are allocated from the

28

funds does not increase or decrease the overall burden on the State. *See, e.g., Koala v. Khosla*, 931 F.3d 887, 895-96 (9th Cir. 2019) (sovereign immunity did not apply where "UCSD's existing policy requires that it collect a compulsory activity fee from each student and remit a percentage of the total to the Associated Students for reallocation to RSOs. The outcome of this lawsuit will not increase or decrease the overall financial burden on the state; it will affect only which RSOs may apply for student activity fees and, potentially, how the total student activity fund is distributed.").

For all these reasons, the district court's reliance on *Seminole Tribe* was in error.

### 3. The district court's holding significantly diminishes the *Ex parte Young* exception.

Finally, this Court should also reverse the district court because the rule it announced – barring claims seeking injunctions that "would have more than a minor effect on state funds," Doc. 58, Pg. 9 – would severely undermine federal courts' abilities to ensure states do not violate the Constitution.

Here in particular, Contract Clause and Takings Clause claims frequently have "more than a minor effect" on state funds because of the

29

nature of the protection provided. *See, e.g., United States Trust Co. v. New Jersey*, 431 U.S. 1, 17, 25-26, 29 (1977) (elements of federal Contract Clause claim include whether the law substantially impairs a contractual relationship); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978) (In a Takings claim, "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are . . . relevant considerations"). And courts have expressly recognized the danger of abuse of the Contract Clause is acute "when the State is a party to the contracts," explaining in that case, "the court cannot defer to the State because the State's self-interest as a party is implicated," *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 505 (5th Cir. 2001).

Indeed, courts have repeatedly upheld plaintiffs' ability to vindicate similar constitutional protections of financial interests under *Ex parte Young. See, e.g., Ex parte Young*, 209 U.S. at 144 (upholding injunction prohibiting Minnesota attorney general from enforcing statute that threatened railroads with "enormous penalties" if they did not lower their rates to "confiscatory" levels as violations of the due process clause);

30

*Pharm. Rsch. & Manufacturers of Am. v. Williams*, 64 F.4th 932, 949-50 (8th Cir. 2023) (sovereign immunity did not bar takings clause suit seeking to enjoin law requiring pharmaceutical companies to provide insulin to patients at no cost); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002) (sovereign immunity did not bar contracts clause claim seeking declaratory and injunctive relief directing future allocations from state insurance fund); *Lipscomb*, 269 F.3d at 500–01 (sovereign immunity did not bar contract clause claim seeking declaratory relief that would prevent state officials from raising rents).

Because affirming the district court's judgment here would effectively insulate these types of constitutional violations on the part of state officials from review, reversal is warranted.

## II. The District Court Erred in Finding Plaintiffs' Claims Time-Barred.

The district also erred when it granted Defendants' motion to dismiss on statute of limitations grounds. In doing so, it did not apply the correct legal standard for determining when Plaintiffs' claims accrued and it did not confine its analysis to the allegations in the Amended Complaint.

31

## A. Plaintiffs' Claims Accrued When Defendants Applied the TDF Law to Their Plans.

"The statute of limitations for a constitutional challenge to a statute is triggered by injury." *Doe v. Swearingen*, 51 F.4th 1295, 1304 (11th Cir. 2022). In the case of an as-applied challenge to a statute, "'the harm inflicted by the statute does not occur until the statute is enforced – in other words, until it is applied.'" *Id.* (quoting *Hillcrest Prop., LLC v. Pasco Cnty.*, 754 F.3d 1279, 1282 (11th Cir. 2014)). "That is why a constitutional cause of action lies exclusively against an official with enforcement power and not the legislature itself." *Id.*

The statute of limitations for Plaintiffs' claims is four years. *See Swearingen*, 51 F.4th at 1303-04. This case was originally filed on Jan. 2, 2024. *See* Doc. 1. Accordingly, the relevant inquiry is whether it is clear – from the face of the complaint – that Plaintiffs' claims accrued prior to Jan. 2, 2020.

The district court held that Plaintiffs' claims accrued on July 1, 2007, when the amendments to Florida Statutes §§ 1009.01, 1009.04, and 1009.98 created the TDF law. Doc. 58, Pg. 13. But in reaching this holding, the Court incorrectly applied the legal standard for a facial challenge to a statute, rather than the standard for an as-applied

32

challenge. *See* Doc. 58, Pg. 14 n. 2 (citing *Hillcrest Prop. LLC v. Pasco County*, 754 F.3d 1279, 1283 (11th Cir. 2014) for the proposition that "a facial due process challenge against a zoning ordinance" accrued "immediately upon the Ordinance's enactment").

Critically, the Plaintiffs did not "identify their injury" as the creation of the TDF law. *See* Doc. 58 at 13. Instead, the Amended Complaint is clear that Plaintiffs are pursuing an "as applied claim," identifying their injury as the "Prepaid's Board Members' and Board ED's continuing and future application and use of the 2007 TDF law and exemption (and as amended) and/or their Plan Contract changes to justify their refusal to transfer a TDF benefit to a Non-Florida State School[.]" Doc. 15, Pgs. 28-29 ¶¶ 83, 91. Unlike a facial challenge, which asserts that a law *always* operates unconstitutionally, "[a]n as-applied challenge . . . addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (quotation omitted).

Because accrual of the statute of limitations for an as-applied challenge is tied to "an injury stemming from the enforcement or threat of enforcement of an unconstitutional law against him[,]" the Eleventh

33

Circuit has made clear that an as-applied constitutional claim "does not necessarily run from a statute's effective date." *Swearingen,* 51 F.4th at 1304. Instead, "[t]o determine when the plaintiffs' claims accrued . . . we must review the operative complaint claim by claim to assess when the plaintiffs were injured by the allegedly unconstitutional actions they are challenging." *Id*. at 1305. This is a fact-intensive inquiry. *Cf. Harris*, 564 F.3d at 1308 ("Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider."). The allegations of the Amended Complaint control the Court's analysis. *See Chapman v. Dunn*, 129 F.4th 1307, 1316 (11th Cir. 2025). The district court did not engage in this fact-intensive inquiry.

The allegations of the Amended Complaint make clear that Defendants did not begin to enforce the statute against Plaintiffs until 2021, at the earliest. Doc. 15, Pg. 19-20 ¶¶ 54-55. Not only was there no "enforcement" in 2007, but Plaintiffs cannot be said to have been reasonably aware of a "threat of enforcement" at that time, either. *See Chapman*, 129 F.4th at 1315 ("The general federal rule is that the statute [of limitations] does not begin to run until the facts which would support

34

a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."). Among other things, in 2007 Plaintiffs would not have known whether their then-preschool-aged beneficiaries would choose to attend a Non-Florida State School. Nor could Plaintiffs know whether the Board Members would choose to make any further amendments to their Plans, or offer some other type of financial compensation before their Plan benefits would come due fourteen years (or more) later. Indeed, in 2020 and 2024 the Board did offer refunds and discounts to other, later purchasers. Doc. 15, Pg. 4-5 ¶ 6; *id.* at Pg. 22 ¶ 63. These uncertainties render any injury to Plaintiffs in 2007 speculative at best. *See, e.g.*, *Tokyo Gwinnett, LLC v. Gwinnett Cty.*, 940 F.3d 1254, 1262 (11th Cir. 2019) ("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.") (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)); *Swearingen*, 51 F.4th at 1304 (11th Cir. 2022) ("a plaintiff lacks standing to challenge legislation that will not be enforced").

In addition, even assuming Plaintiffs could somehow foresee the answers to the above questions, there was precious little information available to Plaintiffs regarding what precise effect the TDF law would have on their Plans – and the information that was available was contradictory. For example, while the district court noted that the preamble to Plaintiffs' Plans expressly stated the Plans were subject to amendments to applicable Florida law, Doc. 58, Pg. 13, the TDF Law itself, including the TDF payment exemption, was silent on how it might apply to Prepaid Plans seeking to transfer the equivalent value of Florida college "rates" to a Non-Florida State School. *See* Doc. 15, Pg. 17 ¶¶ 44-45; Fla Stat. § 1009.24(16)(a)-(b) (TDF law); Fla. Stat § 1009.98(10)(b)(5) (Prepaid Board Programs). Moreover, Defendants' amendment to Plan Contracts was implemented with no notice directed to Plaintiffs that would have explained their reduced benefits and contract values if they used their Plans for Non-Florida State Schools. Doc. 15, Pg. 21 ¶ 59.[6]

---

[6] In addition, discovery would shed light on whether the contents of the contractual amendment would have put Plaintiffs on notice that the TDF would no longer be covered and whether a new contract was sent to them explaining the changes to their benefits. Plaintiffs contend no amendment by Defendants specifically referenced the TDF law and its impact on Plaintiffs' tuition benefit. For instance, The Prepaid Board

Instead, to the reasonably prudent person, the value of their Plan Contracts appeared to remain in place for Plaintiffs' beneficiaries, because the contracts still expressly provided the equivalent amount of their contract transferred equivalent benefits and current *rates* at state colleges would be transferred to Non-Florida State Schools. Doc. 15-3, Pg. 5 § 5.06 (Plan Contract, emphasis added). And Florida Statutes continue to define "registration fee" as a "tuition fee." Fla. Stat. § 1009.97 (3)(g). In addition, the Board did not offer Plaintiffs access to new plans that would have covered the TDF fee. Doc. 15, Pg. 17 ¶ 45; Doc. 15-13, Pg. 9 (advertising TDF plan availability to "new customers"). Finally, after the passage of the TDF law, Defendants' predecessors publicly stated that they were "keeping their promise" to families with Prepaid Plans. Doc. 15, Pg. 14 ¶ 39; *id.* Pg. 16 ¶ 43. Plaintiffs thus could have reasonably believed the Board would preserve the value of their Plan Contracts.

---

implemented an amendment to the "registration fee" definition under later Plan Contracts that merely cited a series of statutory provisions, none of which was the TDF law. Doc. 15, Pgs. 3-4 ¶ 5; Pg. 18 ¶ 49; Pg. 21 ¶ 59; Fla. Admin. Code Ann. R. 19B-4.001(2) (adopting new contracts generally); Fla. Admin. Code Ann. R. 19B-5.001(1)(c) (listing fees included in "registration fee") (repealed 08-24-14); *see also* Doc. 56 at Pg. 9. But this definition is not provided for in Florida Statutes, which still define "registration fee" to include a "*tuition* fee." § 1009.97 (3)(g), Fla. Stat. (2024) (emphasis added).

37

At bottom, the allegations in the Amended Complaint do not compel the conclusion that Plaintiffs "reasonably" should been aware of a concrete and imminent threat of enforcement prior to 2021. As noted, because the statute of limitations is an affirmative defense that a plaintiff is not obligated to negate in her compliant, the Court may affirm dismissal on a statute of limitations defense only if it finds Plaintiffs' Amended Complaint on its face clearly demonstrates that Plaintiffs' claims are time-barred. *Wainberg*, 93 F.4th at 1224. Defendants cannot meet this high bar on this fact-intensive issue.

### B. Defendants Continue to Violate the Constitution Each Time They Interpret and Apply the TDF Law To Deny Plaintiffs Plan Benefits.

In the alternative, even if the Court determines Plaintiffs' claims began accruing prior to 2020, it must still reverse if it finds Plaintiffs have alleged that Defendants are engaged in continuing violation of Plaintiffs' rights. "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Swearingen*, 51 F.4th at 1305 (quoting *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)). As with claim accrual, the question of whether a

violation is continuing is a fact-specific inquiry. *Howard v. Coonrod*, 546 F. Supp. 3d 1121, 1130-31 (M.D. Fla. 2021) (holding motion to dismiss on limitations question premature); *Swearingen*, 51 F.4th at 1306 (conducting "an injury-by-injury and claim-by-claim analysis of the plaintiffs' operative complaint").

In holding the continuing violation doctrine did not apply, the district court found Plaintiffs' claims amounted to "the continued effects of a past violation" (the passage of the TDF law) rather than continuing violations. Doc. 58, Pg. 15. The district court explained: "As pointed out by defendants, the Board has no [ ] power to choose whether to enforce the TDF exemption." *Id.*

But the district court was not permitted to rely on Defendants' assertion that they are powerless to interpret or apply the law any differently to Plaintiffs' Plan Contracts, Doc. 5, Pg. 15. *See Renfroe*, 822 F. 3d at 1242 (finding error where a court "improperly elevate[s]" a defendant's own conclusions above the allegations in the complaint). This is especially true where, as here, the Amended Complaint expressly alleges the opposite. Specifically, it alleges Defendants have the independent authority, among other things, to "provid[e] and pay[]

39

benefits under [Plaintiffs'] Plan contracts, interpret[], apply[], and enforce their terms, and transfer[] the benefits of the Plans to Non-Florida State Schools." Doc. 15, Pgs. 6-8 ¶¶ 14-21 (citing Fla. Stat. § 1009.971(1) and (3)-(6) and Fla. Stat. § 1009.98); *see also id.* at Pg. 18 ¶¶ 49-50 (Defendants have claimed they have the authority to change the substantive terms of their contracts via the Florida Administrative Code); *id.* at Pg. 27-28 ¶ 82 ("Defendants had and have available to them less drastic alternatives than impairing the Prepaid Plan Contract"; "Defendants can choose to transfer the equivalent TDF benefit for the Beneficiaries of Plaintiffs and Class Members who attend Non-Florida State Schools").

Because Plaintiffs allege they are injured each time Defendants interpret and apply their contractual benefits, *see, e.g.*, Doc. 15, Pgs. 19-20 ¶ 54, this case is on all fours with the continuing violations identified in *Swearingen*, 51 F.4th at 1307-09. There, registered sex offenders alleged they suffered reputational injury each time officers visited their residences to verify their information, despite the fact that they had been designated as sex offenders more than twenty years prior. *Id.* The Court explained: "Because the plaintiffs' reputational injury depends on

40

continuing enforcement actions taken by the Commissioner within the limitations period, we believe the continuing violation doctrine applies." *Id.* at 1308. Here, like the officers' ongoing visits to the plaintiffs' residences year after year, Defendants' ongoing refusals to transfer the full value of Plaintiffs' tuition benefit each semester amounts to a continuing injury.

As a result, the district court's finding at the motion to dismiss stage, that Plaintiffs' ongoing and prospective losses do not constitute continuing violations of the Contract Clause and Takings Clause was also in error.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court reverse the district court's dismissal of the case, finding Plaintiffs' claims fall within the *Ex parte Young* exception to sovereign immunity and that Plaintiffs' claims are not time-barred.

Dated: July 30, 2025

Respectfully submitted,

/s/ *Alec H. Schultz*

**HILGERS GRABEN PLLC**
Alec H. Schultz
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
(305) 630-8304
aschultz@hilgersgraben.com

Jennifer M. Erickson Baak
600 17th Street
Denver, CO 80202
(773) 407-5502
jericksonbaak@hilgersgraben.com

**BERGER SINGERMAN LLP**
Mark S. Fistos, Esq.
Florida Bar No. 909191
201 East Las Olas Blvd.
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: (954) 525-9900

mfistos@bergersingerman.com
rpendas@bergersingerman.com
drt@bergersingerman.com

Counsel for Plaintiffs-
Appellants

42

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word count limitations set forth in Fed. R. App. P. 32(a)(7)(B) because it contains 8,102 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2507 Build 16.0.19029.20136) 64-bit in Century Schoolbook 14-point font.

Dated: July 30, 2025

/s/ Alec H. Schultz
Alec H. Schultz

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that on July 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Alec H. Schultz
Alec H. Schultz

## ADDENDUM TO THE PLAINTIFFS-APPELLANT'S BRIEF

### Text of Fla Stat. § 1009.24(16)

(16)    Each university board of trustees may establish a tuition differential for undergraduate courses upon receipt of approval from the Board of Governors. However, beginning July 1, 2014, the Board of Governors may only approve the establishment of or an increase in tuition differential for a state research university designated as a preeminent state research university pursuant to s. 1001.7065(3). The tuition differential shall promote improvements in the quality of undergraduate education and shall provide financial aid to undergraduate students who exhibit financial need.

(a)    Seventy percent of the revenues from the tuition differential shall be expended for purposes of undergraduate education. Such expenditures may include, but are not limited to, increasing course offerings, improving graduation rates, increasing the percentage of undergraduate students who are taught by faculty, decreasing student-faculty ratios, providing salary increases for faculty who have a history of excellent teaching in undergraduate courses, improving the efficiency of the delivery of undergraduate education through academic advisement and counseling, and reducing the percentage of students who graduate with excess hours. This expenditure for undergraduate education may not be used to pay the salaries of graduate teaching assistants. Except as otherwise provided in this subsection, the remaining 30 percent of the revenues from the tuition differential, or the equivalent amount of revenue from private sources, shall be expended to provide financial aid to undergraduate students who exhibit financial need, including students who are scholarship recipients under s. 1009.984, to meet the cost of university attendance. This expenditure for need-based financial aid shall not supplant the amount of need-based aid provided to undergraduate students in the preceding fiscal year from financial aid fee revenues, the direct appropriation for financial assistance provided to state universities in the General Appropriations Act, or from private sources. The total amount of tuition differential waived under subparagraph (b)7. may be included in calculating the

45

expenditures for need-based financial aid to undergraduate students required by this subsection. If the entire tuition and fee costs of resident students who have applied for and received Pell Grant funds have been met and the university has excess funds remaining from the 30 percent of the revenues from the tuition differential required to be used to assist students who exhibit financial need, the university may expend the excess portion in the same manner as required for the other 70 percent of the tuition differential revenues.

(b)   Each tuition differential is subject to the following conditions:

1.   The tuition differential may be assessed on one or more undergraduate courses or on all undergraduate courses at a state university.

2.   The tuition differential may vary by course or courses, by campus or center location, and by institution. Each university board of trustees shall strive to maintain and increase enrollment in degree programs related to math, science, high technology, and other state or regional high-need fields when establishing tuition differentials by course.

3.   For each state university that is designated as a preeminent state research university by the Board of Governors, pursuant to s. 1001.7065, the aggregate sum of tuition and the tuition differential may be increased by no more than 6 percent of the total charged for the aggregate sum of these fees in the preceding fiscal year. The tuition differential may be increased if the university meets or exceeds performance standard targets for that university established annually by the Board of Governors for the following performance standards, amounting to no more than a 2-percent increase in the tuition differential for each performance standard:

a.   An increase in the 4-year graduation rate for full-time, first-time-in-college students, as reported

46

annually to the Integrated Postsecondary Education Data System.

b.   An increase in the total annual research expenditures.

c.   An increase in the total patents awarded by the United States Patent and Trademark Office for the most recent years.

4.   The aggregate sum of undergraduate tuition and fees per credit hour, including the tuition differential, may not exceed the national average of undergraduate tuition and fees at 4-year degree-granting public postsecondary educational institutions.

5.   Beneficiaries having prepaid tuition contracts pursuant to s. 1009.98(2)(b) which were in effect on July 1, 2007, and which remain in effect, are exempt from the payment of the tuition differential.

6.   The tuition differential may not be charged to any student who was in attendance at the university before July 1, 2007, and who maintains continuous enrollment.

7.   The tuition differential may be waived by the university for students who meet the eligibility requirements for the Florida Public Student Assistance Grant Program established in s. 1009.50.

8.   Subject to approval by the Board of Governors, the tuition differential authorized pursuant to this subsection may take effect with the 2009 fall term.

(c)   A university board of trustees may submit a proposal to the Board of Governors to implement a tuition differential for one or more undergraduate courses. At a minimum, the proposal shall:

1.   Identify the course or courses for which the tuition differential will be assessed.

47

2. Indicate the amount that will be assessed for each tuition differential proposed.

3. Indicate the purpose of the tuition differential.

4. Indicate how the revenues from the tuition differential will be used.

5. Indicate how the university will monitor the success of the tuition differential in achieving the purpose for which the tuition differential is being assessed.

(d) The Board of Governors shall review each proposal and advise the university board of trustees of approval of the proposal, the need for additional information or revision to the proposal, or denial of the proposal. The Board of Governors shall establish a process for any university to revise a proposal or appeal a decision of the board.

(e) The Board of Governors shall submit a report to the President of the Senate, the Speaker of the House of Representatives, and the Governor describing the implementation of the provisions of this subsection no later than February 1 of each year. The report shall summarize proposals received by the board during the preceding fiscal year and actions taken by the board in response to such proposals. In addition, the report shall provide the following information for each university that has been approved by the board to assess a tuition differential:

1. The course or courses for which the tuition differential was assessed and the amount assessed.

2. The total revenues generated by the tuition differential.

3. With respect to waivers authorized under subparagraph (b)7., the number of students eligible for a waiver, the number of students receiving a waiver, and the value of waivers provided.

4. Detailed expenditures of the revenues generated by the tuition differential.

48

5.    Changes in retention rates, graduation rates, the percentage of students graduating with more than 110 percent of the hours required for graduation, pass rates on licensure examinations, the number of undergraduate course offerings, the percentage of undergraduate students who are taught by faculty, student-faculty ratios, and the average salaries of faculty who teach undergraduate courses.

(f)    No state university shall be required to lower any tuition differential that was approved by the Board of Governors and in effect prior to January 1, 2009, in order to comply with the provisions of this subsection.

49